UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION


UNITED STATES OF AMERICA,          )
                                   )
   PLAINTIFF,                      ) CASE NO. 2:19-cr-163(1)
                                   )
                    vs.            )
                                   )
YU ZHOU,                           )
                                   )
   DEFENDANT.                      )
_____      )


      TRANSCRIPT OF DETENTION HEARING AUDIO-RECORDED PROCEEDINGS
         BEFORE THE HONORABLE KIMBERLY A. JOLSON, MAGISTRATE
               MONDAY, SEPTEMBER 16, 2019; 3:35 P.M.
                        COLUMBUS, OHIO

      FOR THE PLAINTIFF:
            Benjamin C. Glassman
            United States Attorney
            By:  S. Courter Shimeall
                 Peter Glenn-Applegate
            Assistant United States Attorneys
            303 Marconi Boulevard, 2nd Floor
            Columbus, Ohio 43215

      FOR THE DEFENDANT:
            Seiden Netzky Law Group
            By:  Glenn Seiden, Esq.
            333 South Wabash Avenue, Suite 2700
            Chicago, Illinois 60604

            Neil W. Rosenberg, Esq.
            400 South Fifth Street, Suite 301
            Columbus, Ohio 43215

                          - - -
            Proceedings audio-recorded and later transcribed by
      mechanical stenography, transcript produced by computer.

```
 1                                     Monday Afternoon Session

 2                                       September 16, 2019

 3                              - - -

 4     In open court:

 5          COURTROOM DEPUTY:  Case number 2:19-cr-163, defendant

 6     number 1, United States v. Yu Zhou.

 7          THE COURT:  Good afternoon.  Will counsel please make

 8     their appearances on the record, beginning with counsel for the

 9     government.

10          MR. SHIMEALL:  Good afternoon, Your Honor.  Courter

11     Shimeall appearing with co-counsel Peter Glenn-Applegate on

12     behalf of the United States.

13          THE COURT:  Thank you.

14          MR. SEIDEN:  Glenn Seiden, S-e-i-d-e-n, for Mr. Zhou.

15          MR. ROSENBERG:  And Neil Rosenberg also on behalf of

16     defendant.

17          THE COURT:  Thank you.  This matter comes before the

18     Court on the request of the government to detain the defendant

19     pending trial of this matter.

20          First in considering this request, I'll note that the

21     defendant is entitled to the presumption of innocence.  Nothing

22     that happens in this courtroom or that I set forth in my

23     findings is intended to affect that presumption.

24          Second, under the Bail Reform Act, pretrial detention is

25     an exceptional step.  Under the act, a defendant must be
```

1  released prior to trial unless and until a judicial officer

2  finds that no condition or set of conditions could -- could

3  exist that would both reasonably assure the defendant's

4  appearance at future court proceedings and reasonably assure

5  the safety of the community.

6       Finally, the act requires that the least restrictive

7  conditions be imposed to provide those reasonable assurances.

8       With that backdrop, I'd like to hear evidence from each

9  side, and then we'll move to argument.

10      Mr. Shimeall, how would you like to begin today on

11 behalf of the United States?

12      MR. SHIMEALL:  Your Honor, the United States would

13 proffer the allegations of the indictment as well as the

14 exhibits put forth -- put forth in the previous hearing and

15 draw upon those exhibits in this hearing as well.

16      THE COURT:  Okay.  Thank you.  Defense counsel, how

17 would you like to begin today?

18      MR. SEIDEN:  Your Honor, we have -- we have exhibits,

19 and we have them on the previous matter.  So I'm going to ask

20 to adopt those --

21      THE COURT:  Okay.  Thank you.

22      MR. SEIDEN:  -- to save the trouble.

23      THE COURT:  Thank you.  I appreciate that.  With that,

24 I'm going to ask the United States to begin with argument.

25      MR. SHIMEALL:  Thank you, Your Honor.

1    Your Honor, the United States begins by noting that by

2    all indications the parties at this hearing were also present

3    in the previous hearing, and the United States advances the

4    same arguments, adopts them for the purposes of this hearing,

5    and also points out a couple of additional indicators of the

6    defendant's conduct in this case and for the same reasons that

7    have been stated, believes the defendant to be a substantial

8    risk of flight in exceeding his detention on the grounds of

9    risk of flight.

10    Your Honor, Exhibit 10, which the government drew your

11    attention to previously, which is the letter for Ms. Chen, that

12    exhibit was found on Mr. Zhou's computer that was taken from

13    him, and at the time of his apprehension, indicating that it's

14    not as if this was a scheme put forth solely by Ms. Chen for

15    all the reasons we've talked about, but he had knowledge of

16    this as well, and beyond his own connections with the

17    International Technology Transfer Network, his serving on that

18    committee, and beyond being paid by SAFEA.

19    He was aware of the additional talent pool, the process

20    and applications by Ms. Chen.  And as the indictment indicates

21    in paragraph 20M regarding the November email sent by Ms. Chen,

22    there are indications that Mr. Zhou was also engaged with PRC

23    government programs, talent pooling programs, and that is the

24    November 1st email from 2016, part of which relates to a

25    document regarding his performance as an expert for a Beijing

1    foreign experts and foreign affairs employment center, which is

2    a municipal-level expert program connected to the broader PRC.

3         Your Honor, the United States also points to Exhibit --

4    let's see -- 11.  Mr. Zhou's travel is much more extensive than

5    Ms. Chen's.  He is connected in the Chinese business

6    environment in the same regard that Ms. Chen is, if not with

7    greater depth, because he was the one whose name was on the

8    paperwork for Avalon.

9         Even though Ms. Chen participated, he executed the asset

10   purchase agreement.  He executed the stock purchase agreement,

11   and that asset purchase agreement was the 900 or so thousand

12   dollars in exchange for the intellectual property related to

13   his Chinese company that was then subsumed in the American

14   company.

15        He entered into the executive retention agreement that

16   paid him roughly $160,000 a year by the American company, and

17   he signed an employee invention assignment regarding

18   intellectual property and promised not to work any competitor

19   of GenExosome Technologies here in the United States.

20        The government also points to Exhibit 12 which were

21   documents found on Mr. Zhou at the time of his apprehension.

22   The first document I can proffer to the Court by all

23   indications is a driver's license for Hunan province regarding

24   Mr. Zhou.  It lists his date of birth as well.

25        The second document is some other form of

1    identification.  We are still trying to work through to wrap

2    our arms around what this is, but it bears indications of

3    identification for something in China.

4    And then the third picture is, frankly, what appears to

5    be a cryptocurrency with some sort of roving RSA token.  The

6    agents in the case, at the time of the apprehension and this

7    was seized, indicated that this has some resemblance of a

8    cryptocurrency card that can be used in China.

9    Mr. Zhou indicated in his interview that he has family

10   in China and alluded to parents who are in China.  And, Your

11   Honor, the same reasons regarding Ms. Chen would apply with

12   full, if not more, force to Mr. Zhou again.

13   Again, he was the one whose name was on the documents

14   regarding the American business deals, and he has great

15   business connections in China.  He has no property in this

16   district, and the arguments regarding any property that would

17   be put forth are renewed as to him as well.

18   For these reasons, Your Honor, we do believe that he is

19   a substantial risk of flight, and the preponderance of the

20   evidence shows that he is at great risk of flight and he should

21   remain detained.  Thank you, Your Honor.

22   THE COURT:  Thank you, Mr. Shimeall.  Counsel.

23   MR. SHIMEALL:  Thank you, Judge.

24   MR. SEIDEN:  Good afternoon, Your Honor.

25   THE COURT:  Good afternoon.

1    MR. SEIDEN:  I'm going to adopt -- perhaps I

2    shouldn't -- but I'm going to adopt much of what Mr. Nolder

3    said so that I can save time and this Court's attention.

4    (Inaudible.)

5         I had an opportunity to sit here and listen to all the

6    trade secrets regarding exosome -- I'll get this right --

7    isolation of exosomes; and while I was sitting here, I got on

8    my phone and I looked up exosomes isolation, and I found about

9    five or six companies on the first page that sell commercially

10   exosome isolation kits.

11        This is what the trade secret is that was so very

12   important that shouldn't be taken.  We haven't heard any

13   evidence.  We haven't heard anything that is suggested that

14   anything that has been violated in this case is other than a

15   practice and procedure of a hospital.  Not law.  Nothing that

16   applies to this Court to -- to enforce, except by virtue of a

17   civil case.

18        However, they are suggesting there was a trade secret.

19   I haven't heard anything -- we -- we -- we sat here for 40

20   minutes listening to a lot of words and no substance with

21   regard to what is claimed.

22        The only reason I bring this up is -- I'm not trying the

23   case now, but it is very apparent that during the course of

24   this case, when we do go to trial, the government is far and

25   away -- you are a mile away from any proof.

1       Your Honor, I've been doing this for 45 years.  I

2   virtually never say that.  This is the first time in my career

3   I've ever had to ask that an individual who is attempting to

4   cure cancer, at least to discover cancer in pediatric infants

5   and unborn children, should be faced with detention while his

6   case is being heard.

7       Normally, I have to say, well, I'm worried about this

8   man going back to this country because he sold drugs or because

9   he did something ever so terrible that he's going to run away.

10      We're talking about an individual who has spent ten

11  years attempting to cure right now an incurable disease.

12      The government has argued that there -- that SAFEA --

13  I'm not good with names, Judge.  I mean no disrespect to

14  anybody or any organization if I misname them, but I think he

15  says that SAFEA is company or an organization that attempted to

16  secure people from around the world for the purposes of

17  bringing technology into China.

18      We have that.  We call it the H-1B visa, which is

19  exactly what we do in this country to secure foreign people who

20  have some ability to this country.  It's not against the law

21  here, and it's certainly not against the law there.

22      The travel that Mr. Zhou has done, as the government

23  said, was for conferences, professional exchange of

24  information, to secure -- cure two illnesses.

25      I don't know that you do it, Judge; but for the rest of

1    us who are licensed for a living, we get -- we have to go to

2    conferences all the time to exchange information.

3        And what information are they -- that was claimed to be

4    exchanged?  I heard -- I heard counsel say, and he said it very

5    quickly and very small, but I heard it enough to write it down.

6        The information that was exchanged was previously

7    published research.  Not authorized.  Not authorized by a

8    hospital.  We haven't seen anything to suggest that the

9    hospital has authorized it.

10       We haven't seen any agreement.  We haven't seen any

11   cease-and-desist memo.  We haven't seen anything.

12       Just that this previously published information is part

13   of the conferences that this man has gone to to other

14   countries.

15       He's been here performing this research.  He and his

16   wife, who is now detained, thought enough of this country to

17   become citizens, buy a house, earn money, send their child to

18   Johns Hopkins -- again, I'm bad with names -- who is currently

19   at Johns Hopkins as a student.

20       There's not only no reason for him to leave.  There is

21   more than enough reason for him to claim his innocence and be

22   here.  He's thought enough to have a lawyer, me, from

23   another -- another area, not that Southern District doesn't

24   have any fine lawyers here --

25            THE COURT:  I was -- you better be careful.

1      MR. SEIDEN:  I have one sitting right here.  But they

2  have invested in having attorneys in this case and attorneys

3  represent him to claim his innocence and make the government

4  prove his guilt.

5      I don't like talking about the underlying case because

6  this is not the purpose of this hearing.  Apparently, it was

7  for about 35 or 40 minutes before, but it's not the purpose of

8  the hearing.

9      But I do have to recognize the fact that exosome

10  isolation kits are not the sole exclusive property of

11  Nationwide Children's Hospital.  They are manufactured

12  commercially by companies all over the country, indeed, all

13  over the world, and they are used to further research.

14      And that is the purpose of conferences.  Unauthorized

15  is -- are we here because somebody at a hospital -- remember, a

16  hospital is not a person -- because somebody at a hospital has

17  failed to disclose an email indicating that there was a leave

18  taken to go to another country for -- for a conference?

19      Is it probable that Mr. Zhou could have picked up,

20  walked away from his station at the hospital during his

21  research for a week or two to go to a conference without

22  somebody noticing?  No, it's not.

23      So any argument or any suggestion that these were

24  unauthorized, we're a long way from establishing that indeed

25  they are unauthorized or unknown.

1    So we are here, Judge, because this man has apparently

2    gone to some conferences, taken information that was previously

3    published and of record, that any individual could go on the

4    internet and any individual who knew where to look could find

5    it, that any individual could get the -- this trade secret

6    isolation kit that is sold by numbers of companies around the

7    world, and we're sitting here worried about whether or not he's

8    going to flee to China to do that.

9    Why would he flee?  Why would he have spent the money --

10   why would he and his wife spend a million two to buy a house in

11   San Diego?  Why would they have put the money into an account

12   where everyone can see it?

13   Why would he have gone into business with Avalon, which

14   is American company -- it's not a Chinese company -- located in

15   New Jersey for the purpose of continuing the research?

16   Is this an individual who is hell bent on vacating the

17   United States after getting -- becoming a citizen to be here?

18   It is not.

19   This is not an individual who has any interest in

20   leaving this country for any other reason -- for the reason of

21   this case to be sure.

22   Since I've adopted Mr. Nolder's argument, I don't have

23   to revisit the *You* case.  You've already read it during the

24   break.  I know that's the case, and I don't have to adopt the

25   fact that they have substantial roots here and enough roots

1  where there are people who are willing to step up -- you've

2  already heard about them -- and place their property at risk,

3  their good names at risk, on behalf of my client.

4      The government has indicated that there is a substantial

5  loss, but they have failed either in the indictment or in their

6  argument to monetize that loss.

7      Nobody has.  Nobody has suggested in any piece of paper

8  that has been before this Court, in the indictment to be sure,

9  that the amount of loss is a number.  Nobody has suggested that

10 the hospital was going to monetize any of this research.

11     By the way, in the afternoons, Judge, I have to keep my

12 voice up or it disappears.  I'm not yelling at you, and I'm not

13 yelling at this court.  This is a defect that I have that

14 maybe -- maybe Dr. Chen -- Dr. Zhou will eventually look into.

15     But be that as it may, the government said that he went

16 to these conferences and he was required to disclose it.  I saw

17 no evidence of a requirement to disclose.

18     He came in with this very nifty little book saying that

19 are some -- that there are an awful lot of things here that

20 they can't read, but they are in here.

21     But it is improbable to believe that he could have gone

22 to these conferences over a period of ten years and just not

23 have gotten that information across to his bosses at the

24 hospital.

25     Indeed, he has been involved with professional

1 organizations not only here but abroad. That is not a

2 suggestion. That does need to -- it should not lead this Court

3 to believe that he is a part of -- a participant in any

4 professional -- in any professional group, that that would

5 cause him to give him the comfort to leave.

6     That is really nothing more than recognition of his

7 contribution over the years to medical science.

8     He is a citizen. He has no prior criminality. He has

9 kept his property here. He has kept his property in American

10 banks and institutions.

11     He has associated with and became, I should say, in a

12 loose term, partners with a substantial public American

13 company. He's taking a position with an American company, an

14 executive position.

15     I have not seen a single document seized from -- from

16 the NCH of any violation of any of their policies and

17 principles, which again troubles me because we're not here for

18 that.

19     They are suggesting that he's stolen trade secrets and

20 taken them abroad. Respectfully, Your Honor, again, no

21 disrespect to anybody, this is -- since I've looked at this

22 case, I feel like it should be in civil -- in civil court.

23     There's been no cease-and-desist order. I've not seen

24 an original employment agreement. I haven't seen any of those

25 things.

1    Nobody has sued Avalon to prevent them from using the

2    information they have gotten.  I find that to be amazing.

3    Remarkable.  Truly.

4         I haven't found -- I haven't seen anything about any of

5    that.  There's nothing here that suggests that this man should

6    leave the country to avoid facing this matter.

7         Surety has been discussed.  I heard your comments about

8    your feelings regarding the surety that's been offered, but

9    I'll say this, Your Honor, and you don't necessarily want to

10   hear all my opinions about bonds, but over the years I find

11   that a promise to come to court for most people is stronger

12   than any bond that they can put up.

13        Quite frankly, a person who puts up a million dollar

14   bond, if they are willing to go, they go.

15        It would be disingenuous for me to suggest to this Court

16   that that's not true, and you know as well as I do that people

17   enter OR bonds every day who could very well go and stay.

18        It's a person's promise.  It's their character.  It's

19   what they are made of that brings them back to court.

20        Now, the courts and, of course, the government always

21   feels more comfortable to know that somebody else may be on the

22   hook or some property for something had that they spent their

23   life building toward on the hook.

24        For example, he and his wife spent years built toward

25   buying a place in San Diego.  Why would they do that is beyond

1    me, but that's my opinion of California.  It doesn't count.

2         What does count is they have expended all their

3    resources for this purpose, and they have taken a mortgage of

4    half a million dollars because they expect to be around to pay

5    it.

6         He does certainly.  His character, his experience, is

7    that of a doctor, that of a Ph.D., that of a medical doctor.

8    He's unlicensed in the country, but he was licensed at one

9    point to practice to be a surgeon.

10        His character is that of an individual who stands up and

11   says what I did was right and what they have alleged is not

12   right.  It is wrong.  I will be here to face this case.  I will

13   hire a lawyer.  I will hire two lawyers.  I will present my

14   case to the Court.  I will make the government prove their case

15   beyond a reasonable doubt.  I will be here.

16        That is his character.  That is his nature.  And, Your

17   Honor, we ask that you release him so he can -- well, normally

18   I would stop there, but the nature of this case is quite

19   complex.

20        I must tell you I learned nothing about exosomes when I

21   was in law school and anything thereafter.

22        There is going to be a substantial amount of information

23   that we as attorneys are employed to have to learn, and that's

24   going to be part of it.  He will best help his defense if he is

25   released.

1        Your Honor, I ask -- I ask you to consider that.  He's

2   going nowhere here, except for here, Your Honor.

3        THE COURT:  Thank you.

4        MR. SEIDEN:  Thank you.

5        THE COURT:  Mr. Shimeall, anything more?

6        MR. SHIMEALL:  Yes, Your Honor.

7        Respectfully, Your Honor, many if not all of the points

8   raised by Mr. Seiden do not go to the issue of detention.  The

9   propriety or the veracity, the isolation method and the trade

10  secrets at issue in this case, we do agree, will be borne out

11  at trial, but that is not germane to the issue of detention.

12       The propriety of SAFEA's efforts to harvest foreign IP

13  are not germane to the issue of detention.  What is important

14  is that he was engaged with the Chinese government, including

15  SAFEA, regarding the taking of foreign intellectual property.

16       The point about him being a citizen, Your Honor,

17  Mr. Zhou obtained citizenship in 2017 in the thick of the

18  ongoing fraud, so we think that should be given minimal weight,

19  and Mr. Seiden made a number of other points about value and

20  evidence and, of course, discovery has now begun, and we will

21  be providing him substantial documentation regarding this case,

22  and we're happy to do that, but, again, those are things that

23  will be borne out at trial.

24       To the extent, as Mr. Seiden said, that Mr. Zhou's

25  appearance hinges on his character, we think that for the

1    reasons we have put forth so far, that is a flimsy surety for

2    him to appear before this Court going forward.

3         For these reasons and all that we've put forth so far,

4    we believe he is a flight risk by a preponderance of the

5    evidence.

6         Thank you, Your Honor.

7              THE COURT:  Mr. Shimeall --

8              MR. SHIMEALL:  Yes.

9              THE COURT:  -- today and both you and your opposing

10   counsel have relied on the previous hearing for expedience, but

11   I do want to ask you --

12             MR. SHIMEALL:  Yes.

13             THE COURT:  -- with focusing on this particular

14   defendant, which is what I must do at this point --

15             MR. SHIMEALL:  Yes.

16             THE COURT:  -- in considering the exhibits, which ones

17   are more important as to whether I should detain this

18   defendant?

19             MR. SHIMEALL:  Your Honor, there are a number.  His

20   connections in China are important.  The defendant has a

21   driver's license in China.  He has additional identification

22   are cards related to China.  The defendant's business

23   connections are also important.

24        As the press release has indicated, and the defendant is

25   mentioned in several of the press releases, his company,

1   through his actions, had helped forge partnerships with

2   entities in China regarding exosomes.

3       Those business connections are germane because again,

4   Your Honor, he can get back to China and proceed on about his

5   life with minimal interference.

6       As we indicated, Beijing Jieteng is the defendant's

7   company along with his co-defendant, and Beijing Jieteng by all

8   indications has a Chinese bank account.

9       We have not been able to access those funds, of course,

10  but we are aware that Beijing Jieteng, again, within the last

11  five years, had about 400 -- a little north of $400,000 in U.S.

12  dollars of registered capital in China.

13      Your Honor, the level of deceit, of course, is borne out

14  by the exhibits as well as by the overt acts listed in the

15  indictment that the grand jury found by probable cause.

16      I think, you know, the exhibits that I've highlighted so

17  far indicate that he has connections in China and that he would

18  return on about his life, in addition to the other exhibits

19  that we put forth for Ms. Chen.

20          THE COURT:  Thank you, Mr. Shimeall.

21          MR. SHIMEALL:  Thank you, Your Honor.

22          THE COURT:  Mr. Seiden, anything further?

23          MR. SEIDEN:  He is only a citizen of one country, Your

24  Honor.  That is the United States.  The other citizenship has

25  been disposed of.

1       With regard to there was an argument earlier about a

2  potential driver's license and some other document, those are

3  documents -- if you take a look at them -- you'll see he was

4  much younger then, and those are historical documents.

5       Your Honor, I've made my argument.  Thank you very much.

6       THE COURT:  Thank you.  The Court will take a very

7  brief recess.

8       COURTROOM DEPUTY:  Please rise.  The Court is in

9  recess.

10     (Recess taken.)

11       COURTROOM DEPUTY:  Please be seated.

12       THE COURT:  In considering the government's request to

13  detain the defendant, I must consider a number of factors under

14  the Bail Reform Act, including the nature and circumstances of

15  the alleged offense, the weight of the evidence against the

16  defendant, the history and characteristics of the defendant,

17  and the nature and seriousness of dangers to others in the

18  community.

19       The government has asked me to detain the defendant on

20  the basis of a risk of flight.  Accordingly, the government

21  must carry its burden by a preponderance of the evidence.

22       I find that the government has shown that the defendant

23  has meaningful connections to a foreign country, both family

24  connections and business connections, and also has had

25  considerable ties to a number of people in China who have

1    governmental access.

2           And so for those reasons, I find that the government has

3    shown me that there is a risk.

4           So then the next question becomes if there are

5    conditions that I can impose upon the defendant to mitigate any

6    of those risks.

7           In looking with specificity at the history and

8    characteristics of the defendant, I find that there are not.

9           Most importantly, because the ties to another country

10   are so deep, and looking at the ties the defendant has to our

11   district, and even to the United States, they are fairly

12   slight.

13          I will note that I appreciate that the defendant does

14   have a son here in the United States who is at Johns Hopkins,

15   but from my perspective that's the most meaningful tie and, of

16   course, the child is of an age at which he can take care of

17   himself.

18          I realize too that counsel -- defense counsel,

19   Mr. Seiden, ably has argued that the defendant has legitimate

20   defenses, and maybe those will carry the day at trial.

21          But for today's purposes I must ask if there is an

22   incentive to flee, and if there is a means to flee.  And a

23   grand jury in the Southern District of Ohio found that there

24   was enough proof to charge the defendant.

25          If the defendant is convicted, he would face up to 20

1   years of in prison, so there is a strong incentive to flee, and

2   again I find that he has means.

3       He has financial means, and he also has a way to start

4   another life or, I should say, continue another life in China.

5       Based on the travel records I have in front of me, the

6   defendant has traveled to China very frequently in the last

7   couple of years.

8       So for all of these reasons, I find the government has

9   carried its burden, and the defendant will be remanded to the

10  custody of the U.S. marshals.

11      Is there anything further on behalf of the government

12  today?

13          MR. SHIMEALL:  No, Your Honor.

14          THE COURT:  Anything more on behalf of the defendant?

15          MR. SEIDEN:  Nothing, Your Honor.

16          THE COURT:  Thank you.  Please adjourn court.

17      (The proceedings were adjourned at 4:09 p.m.)

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3          I, Allison A. Kimmel, do hereby certify that the

4     foregoing is a true and correct transcript of the

5     audio-recorded proceedings before the Honorable Kimberly A.

6     Jolson, Magistrate Judge, in the United States District Court,

7     Southern District of Ohio, Eastern Division, on the date

8     indicated, reported by me in shorthand and transcribed by me or

9     under my supervision.

10

11

12                         s/Allison A. Kimmel
                           Allison A. Kimmel, FAPR, RDR, CRR, CRC
13                         Official Federal Court Reporter
                           October 1, 2019
14

15

16

17

18

19

20

21

22

23

24

25