# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br> Plaintiff, <br><br> v. <br><br> YU ZHOU (1), <br> Defendant. | CASE NO. 2:19-cr-163(1) <br><br> JUDGE SARAH D. MORRISON |

## SENTENCING MEMORANDUM OF THE UNITED STATES

The United States submits its Sentencing Memorandum regarding Defendant Yu Zhou, whose sentencing is set for April 13, 2021, at 2:00 p.m. For the reasons below, the United States recommends the following sentence: 36 months' incarceration, forfeiture in the manner explained below, supervised release of 3 years, and restitution of $2,616,087, jointly and severally with codefendant Li Chen.

## I. BACKGROUND

The Defendant, Yu Zhou, and Li Chen worked at Nationwide Children's Hospital (NCH or the Hospital) as researchers starting in 2007 and 2008, respectively. Over the course of several years before they departed from the Hospital, they executed a scheme to set up businesses in China, steal cutting-edge exosome research from NCH, and profit from doing so. On July 24, 2019, after a multi-year investigation led by FBI, a Grand Jury in this District returned an Indictment charging Zhou and Chen with various violations of the Economic Espionage Act, including one count of Conspiracy to Commit Theft of Trade Secrets, in violation of 18 U.S.C. § 1832(a)(5), and multiple counts of Theft of Trade Secrets—two for Zhou, three for Chen—in violation of 18 U.S.C. §§ 1832(a)(1)–(4). The Indictment also charged both Defendants with one count of Conspiracy to

Commit Wire Fraud, in violation of 18 U.S.C. § 1349, and one or both Defendants with 22 counts of Wire Fraud, in violation of 18 U.S.C. § 1343.

On December 11, 2020, Zhou entered a plea of guilty to Count 1 of the Indictment, which charged him with Conspiracy to Commit Theft of Trade Secrets, and Count 5 of the Indictment, which charged him with Conspiracy to Commit Wire Fraud. The parties entered the plea agreement pursuant to Rule 11(c)(1)(C), with an agreed-upon range of incarceration of between 24 and 84 months, as well as the following Guidelines recommendations:

- A base offense level of 7 (U.S.S.G. § 2B1.1(a)(1));
- The parties reserved the right to make arguments about the amount of loss in this case, and therefore about the commensurate Guidelines increase tied to that loss amount (*id.* § 2B1.1(b));
- A 2-level sophisticated-means enhancement (*id.* § 2B1.1(b)(10));
- The parties agreed that the facts support a 4-level increase for benefitting a foreign government or instrumentality, but reserved the right to make arguments about whether this enhancement is legally proper under the circumstances (*id.* § 2B1.1(b)(14)); and
- A 2-level increase for the abuse of a position of a trust (*id.* § 3B1.3)).

As part of the Plea Agreement, the Defendant has agreed to pay restitution as determined by the Court. (ECF No. 127, ¶ 9.) He has also agreed to forfeit any intellectual property involved in the crimes of conviction, any intellectual property developed from the start of his employment at NCH through the date of his arrest in this case, any property used in the commission of the offenses of conviction, and any proceeds of the offenses of conviction. (*See id.*) This matter is set for sentencing on April 13, 2021.

II. **GUIDELINES RANGE/PRESENTENCE INVESTIGATION REPORT**

The Probation Officer issued a final Presentence Report (PSR) on March 16, 2021. The PSR recommended the following enhancements in reaching a total offense level of 28:

- Base offense level: 7 (U.S.S.G. § 2B1.1(a)(1));
- Loss enhancement: +16 (*id.* § 2B1.1(b)(1)(I));
- Substantial part of scheme outside of U.S.: +2 (*id.* § 2B1.1(b)(10)(B));
- Benefit of foreign government or instrumentality: +4 (*id.* § 2B1.1(b)(14)(B));
- Position of public or private trust: +2 (*id.* § 3B1.3); and
- Less 3 points for acceptance of responsibility (*id.* § 3E1.1(b)).

The PSR further calculated the Defendant's Criminal History Category (CH) as I, with a resulting range of 78–97 months. (PSR, ECF No. 154, ¶ 126.) The Probation Officer did not identify any factors warranting departure from the guidelines range. (*Id.* ¶ 142.)[1] Counsel for Zhou brings four categories of objections to the PSR's calculations. For sake of clarity, the Government responds in the order the objections are laid out in the PSR. (*See id.* at PAGEID #s: 1227–31.) As explained below, the Court should overrule the objections.

### A. Factual Objections

Zhou first objects to the "Offense Conduct" section of the PSR, Paragraphs 19–63, insofar as they describe the scheme as taking place between 2013 and 2018. As the Defendant sees it, the scheme began in the summer of 2017. The Defendant is incorrect. The PSR properly conveys the timeframe of the scheme. In one of the first paragraphs of the agreed-upon Statement of Facts, the Defendant agreed to the following: "YU ZHOU stipulates and agrees that if this case proceeded to trial, the United States would prove each allegation in the Indictment beyond a reasonable doubt. Each allegation in the Indictment is incorporated to this Statement of Facts by reference." (ECF No. 127, at PAGEID #: 1045.) And the Indictment makes clear that the conspiracy began in 2013. (ECF No. 6 ¶ 18 (alleging theft of trade secrets conspiracy beginning in 2013); *see id.* ¶¶ 23–24

---

[1] The Government is seeking an adjusted Guidelines range of 57–71. For the reasons stated in this Memorandum, for those in any of the parties' other filings related to sentencing, and in recognition of the Court's prior sentence of 30 months' incarceration regarding Chen, the Government seeks a sentence of 36 months' incarceration for Zhou.

(alleging a parallel wire-fraud scheme along the same timeline).) Moreover, the Indictment alleges specific acts taken in furtherance of the conspiracies that were taken in 2013 and 2014 (*id.* ¶¶ 20a, 20b), and that the Defendant took actions in furtherance of the scheme, at the latest, by September of 2015 (*id.* ¶ 20c). The PSR therefore accurately describes the timeframe of the offense conduct.

Zhou also objects to Paragraphs 26, 27, and 31 of the PSR, arguing that Li Chen's interactions with the person named in the Indictment as Person B were not nefarious in nature. The Government disagrees; the PSR properly includes that conduct. A Grand Jury in this District found that the actions outlined in these Paragraphs were taken in furtherance of the conspiracy. (*See* ECF No. 6 ¶¶ 20a, 20b, 20g.) In his Statement of Facts, the Defendant admitted these facts by incorporation. (ECF No. 127, at PAGEID #: 1045.) Li Chen also admitted that these actions were taken in furtherance of the conspiracy. Moreover, Chen's participation in the foreign research related to Person B was unauthorized by NCH. (*See* ECF No. 6 ¶ 20g.) This included participation with respect to the submission of grants to the National Natural Science Foundation of China (NSFC), an instrumentality of the Government of the People's Republic of China (the PRC Government). (*See id.*) Some of these submissions to the NSFC, including submissions described in the Indictment and incorporated into the Statement of Facts, depicted NCH research and intellectual property—without the prior consent of NCH. These Paragraphs are properly included in the PSR.

Zhou next objects to Paragraph 36 mentioning that Dr. Gail Besner, the head of Zhou's lab, was involved in the development of Trade Secret 1. He contends that Dr. Besner had no role in the development of Trade Secret 1 and was not aware of its development. The facts show otherwise. When he entered his guilty plea, Zhou admitted under oath to veracity of Trade Secret

4

1, and that Dr. Besner was involved in the development of Trade Secret 1. (*See* ECF No. 6, ¶ 10; ECF No. 127, at PAGEID #: 1045 (incorporating all allegations of the Indictment into the Statement of Facts.) These admissions are supported by the evidence. There are contemporaneous lab notes related to the research the Defendant was conducting at the direction of Dr. Besner. (*See, e.g.*, ECF No. 154-2, at PAGEID #s: 1240–75.) Those notes were put together for weekly lab meetings in January of 2014, where the Defendant and his colleagues updated Dr. Besner about the progress of their research. (*See id.*) Those notes discuss the research underlying Trade Secret 1—namely, the isolation of exosomes from small amounts of serum. (*See id.* at PAGEID #: 1246 (noting the total isolation volume as 10 microliters); *id.* at PAGEID #: 1273 (same).) That research then ended up in an NIH grant application that was submitted in late 2013, and then funded in 2014. (*See generally id.* at PAGEID #s: 1276–78 (a September 2013 pre-NIH grant write-up summarizing the key information for the then-forthcoming NIH grant regarding exosome isolation); *see id.* at PAGEID #: 1276 (describing the aim of the work as follows: "To isolate exosomes from the serum and urine of patients with NEC and age-matched control patients . . . ."); *id.* at PAGEID #: 1277 (noting, in the feasibility section of the write-up: "We have successfully isolated exosomes from small amounts of serum from experimental animals (see preliminary data).").) That application was eventually funded. In other words, both Zhou's admissions and the evidence show that Dr. Besner was aware of the research, directed the research, and oversaw weekly briefings regarding the research, all of which was part of her lab's successful NIH application.

Zhou also objects to Paragraph 36's discussion of Trade Secret 1, on the grounds that neither he, nor NCH, nor Dr. Besner used Trade Secret 1 for anything related to any project for

NCH. Again, this is not true. Zhou has admitted under oath that Zhou and Dr. Besner developed Trade Secret 1 during Zhou's time at NCH and that the hospital owned Trade Secret 1. (*See* ECF No. 6, ¶¶ 10, 12; ECF No. 127, at PAGEID #: 1045 (incorporating all allegations of the Indictment into the Statement of Facts).) He also admitted that the exosome-isolation method "allowed NCH to utilize exosomes from miniscule amounts of fluid in furtherance of necrotizing enterocolitis research." (*See* ECF No. 127, at PAGEID #: 1046.) As explained above, the research underlying Trade Secret 1 was part of the NIH grant award. That money then funded further isolation of exosomes from small amounts with the use of the Trade Secret 1—all as part of research devoted to the treatment of necrotizing enterocolitis (or NEC), which is an intestine disorder found in small children. (*See, e.g.*, ECF No. 154-2, at PAGEID #: 1276; *see also generally id.* at PAGEID #s: 1240–75.)

Zhou pushes this objection further by disagreeing with Paragraph 36's statement that, as a result of the theft, "NCH was no longer able to isolate exosomes from a small amount of fluid." According to Zhou, NCH performed exosome isolation via commercially available kits. Once again, the assertions in Zhou's objections conflict with admissions he has made under oath. In his Statement of Facts, Zhou said that the lab where he "worked to develop" the exosome-isolation "method because there was no commercially available product that could perform the task of isolating exosomes from serum samples as small as 20 microliters." (ECF No. 127, at PAGEID #: 1046.) Isolating exosomes from samples that small "was vital to the research being conducted in ZHOU's lab at NCH." (*Id.*) Some of the exosomes were isolated using commercial kits. But some weren't, as the contemporaneous lab notes and NIH-related research clearly state. (*See, e.g.*, ECF No. 154-2, at PAGEID #: 1277; *see also id.* at PAGEID #s: 1246, 1273.) Moreover, the

6

whole reason that NCH and Dr. Besner developed Trade Secret 1 was out of necessity, because—at that point in time—there simply was no commercially available isolation method that would allow for the isolation of exosomes from sample sizes as small as 10 or 20 microliters, as Zhou has admitted. (ECF No. 127, at PAGEID #: 1046.) This negates the Defendant's contention that the research can continue without issue at the Hospital because it can be done with off-the-shelf kits. So does the fact that none of the remaining employees in Dr. Besner's lab have been able to recreate the isolation method underlying Trade Secret 1—a method that was created while the Defendant was there, and has ceased to be found at NCH since he left.

Finally, the Defendant contends that he left in October 2017, and that Trade Secret 1 wasn't completely developed until the Spring of 2018. As explained, the method underlying Trade Secret 1 was discovered well before Zhou left, around the time of the NIH grant submission. He has admitted that the novel exosome-isolation method was developed "during ZHOU's tenure at NCH." (ECF No. 127, at PAGEID #: 1045–46.) Zhou tries to counter this by arguing that the isolation kits he tried to make are synonymous with Trade Secret 1, that they weren't fully created until 2018, and that they didn't even fully work properly. These arguments are distractions from the fact that the *actual isolation method* underlying Trade Secret 1 was created at NCH, in Dr. Besner's lab, when Zhou was there in 2013 and 2014. The kits are not the same as the original creation of the method. They only came into play later, when Zhou himself tried to take the isolation method that is Trade Secret 1 and operationalize that isolation method commercially, in the form of the isolation kits. That the kits didn't fully work well is of no moment either. The isolation method of Trade Secret 1 was the recipe. That Zhou took that recipe but couldn't properly cook the dish (in the form of the kits) has more to do with Zhou than it does the underlying recipe.

7

The Defendant's own words end the discussion. Zhou applied for a Chinese patent in 2016 for technology that allowed someone to "quickly isolate exosome[s] from small amount[s] of serum." (ECF No. 152-2, at PAGEID #: 1279 (Chinese patent application).) Also in 2016, the Defendant submitted an application to the State Administration of Foreign Expert Affairs (SAFEA), in which he explained that the intellectual property underlying the isolation kit at issue had already been patented by that time. (*See id.* at PAGEID #: 1292 (describing Zhou's exosome isolation product, and referring to it as his company's "patented intellectual property product").) This undercuts his statement in the objection letter that Trade Secret 1 wasn't fully developed until 2018. In addition, in getting ready to launch their products and services in China, the Defendants put together a timeline of their discoveries and achievements in the exosome world, what they called, "Major achievements of the research team." (*Id.* at PAGEID #: 1318.) Here are two of note: "Discovery of a new method for extracting exosomes from body fluids," which they trace to October 2015, and "Refined an exosome isolation technique to more efficiently isolate exosomes using small doses (50-100 ul) of body fluids," which they say occurred in March 2016. (*Id.*) Any way they slice it, the isolation method occurred before 2018, at a time the Defendants worked at the Hospital, all related to research the Hospital was conducting then.

### B. Objections 1 and 2

As to the Guidelines, Zhou first objects to a 16-level increase to the base offense level under U.S.S.G. § 2B1.1(b)(1)(I) based on the loss value falling between $1.5 and $3.5 million. (*See* PSR, ¶¶ 74–75.) He proposes a novel way to calculate the loss in this case, which, he argues, comes to just under $1.5 million. In a related objection, Zhou argues that the presentence report inaccurately states that NCH suffered a loss and that restitution is owed. (*See* PSR, ¶ 140.)

8

The Government disagrees on both fronts. Regarding the latter, the Hospital's loss was total—that is, after Zhou's and his codefendant's criminal acts, the Hospital was no longer able to employ the exosome-isolation method that comprises Trade Secret 1. Regarding the former, the Court already decided this issue when it sentenced Chen. Consistent with the Government's prior position on this issue, the best measure of the value of the intellectual property the Hospital lost is what Avalon later paid Zhou and Chen for it. When the Defendants sold all exosome-related intellectual property purportedly owned by them to Avalon, they received in exchange a total of $1,226,087 in U.S. Currency, 500,000 shares of Avalon common stock, and 400 shares of GenExosome common stock. Consistent with the Government's position at Chen's sentencing, $2.78 is the proper way to value the stock, since that was the closing value on November 5, 2018, the date the shares were first traded publicly. (*See* ECF No. 127, at PAGEID #: 1047.) Adding $1,226,087 in cash to 500,000 shares multiplied by $2.78 per share comes to $2,616,087. The Court agreed that this was the proper loss value and restitution amount with respect to Chen. Zhou offers no persuasive reason to deviate with the Court's prior finding here, and the Government sees none. For these reasons, the PSR properly calculated the loss value and corresponding 16-point enhancement, and the Court should order that amount in restitution to the Hospital.

### C. Objection 3

The Defendant also objects to the assessment of both a sophisticated-means enhancement under 2B1.1(b)(10) and an enhancement for benefitting a foreign government or instrumentality under 2B1.1(b)(14). He argues that the reasoning for the assessment of the enhancements is duplicative. It is not. The sophisticated-means enhancement in 2B1.1(b)(10) applies in any of three scenarios:

> If (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means . . . .

All three scenarios apply here under the facts of this case. Even if that were not true, and the enhancement were premised just on the scheme having taken place in substantial part outside of the United States, it still wouldn't support the Defendant's argument. Just because a scheme took place outside of America doesn't necessarily mean it was done with the knowledge that it would benefit a foreign government or instrumentality. In other words, it would be possible to conduct a fraudulent scheme in China with no connection to the PRC Government. Zhou does not develop this argument and presents no case law supporting his interpretation of the Guidelines. Therefore, the enhancements aim at different conduct, the reasoning for each of the enhancements here is distinct, and the enhancements were properly applied.

\* \* \*

The PSR properly calculated the total offense level (28) and CH (I), as well as the advisory Guidelines range of 78–97 months. The Court should overrule the Defendant's objections.

### III. <u>ANALYSIS AND RECOMMENDATION OF THE UNITED STATES:</u>

Sentencing requires a determination of the applicable guideline range, whether a departure is appropriate, and a consideration of the factors in 18 U.S.C. § 3553(a). *See Gall v. United States*, 552 U.S. 38, 49–50 (2007). This is a serious offense. The Defendant stole sensitive, cutting-edge research that NCH took years to develop and extensive measures to keep secret. In doing so, he willingly took part in the Chinese Government's long-term efforts to steal American intellectual property. And in doing so, acted behind the Hospital's back, used Hospital resources and property,

and violated the Hospital's trust, all to enrich himself to the detriment of the Hospital's research interests and reputation. For these reasons, and those below, the Government recommends a sentence of 36 months' incarceration, forfeiture as described below, supervised release of 3 years, and restitution of $2,616,087.

*Nature and circumstances: Zhou exploited NCH's trust to steal sensitive information and enrich himself as part of an intentional, years-long fraud scheme.* Dr. Gail Besner is the Chief of Pediatric Surgery at NCH. She also ran the research lab where Zhou worked. During Zhou's ten years with NCH, Dr. Besner—despite maintaining her medical and surgical practice—devoted time and resources to developing Zhou's career. Anytime he was to give a presentation at a conference, she worked with him to refine the message, improve his presentation skills, and become more confident in his English. With Dr. Besner's guidance, Zhou grew into one of her best and most trusted researchers.

Dr. Besner's lab came to focus its efforts on researching ways to identify and treat NEC, a life-threatening intestinal condition that often afflicts premature infants. Her lab was one of the first in the world to consider the use of exosomes in this arena. Long thought to be trash receptacles that merely held cellular waste, Dr. Besner's lab was at the forefront of identifying exosomes as unique cell-bound sacs that carried RNA, microRNA, and DNA, all of which could be used as biomarkers for disease diagnosis and prognosis. In order to be utilized fully for treatment and research, the lab had to separate exosomes from non-exosome components—a process called "exosome isolation." The challenge with this, however, is that exosomes are extremely small. This challenge was further compounded in Dr. Besner's lab, where exosomes had to be isolated from the small amounts of serum samples that can safely be taken from premature babies. And

while there were commercially available isolation kits in 2013 and 2014, none worked to isolate exosomes from such samples of serum. To address this challenge, Dr. Besner oversaw Zhou's, and his colleagues', development of Trade Secret 1: a novel method of exosome isolation from as little as 20 microliters of fluid—about four-thousandths of a teaspoon, or one drop of blood.

As Dr. Besner's lab came to develop this cutting-edge technology, Zhou and Chen then began to exploit the trust they built up with NCH. The timeline lines right up. In 2013, Dr. Besner's lab used the preliminary data regarding the new isolation method as part of an NIH grant application. In 2014, that grant was funded. Zhou then went to work to take the method and try to make money from it. In 2015, he and Chen started an exosome company in China without NCH's knowledge or approval. In 2016, Zhou and Chen obtained patents in China relating to the isolation technology developed at NCH. In 2017, Zhou started a parallel exosome company in America without NCH's knowledge and approval. All throughout this time, Zhou and Chen sought and received funds from the PRC Government related to the exosome technology developed at NCH. In doing so, they submitted detailed progress reports to PRC Government programs that described the same research they were conducting at NCH, including isolation from small amounts of exosomes. They also led and attended conferences where they presented sensitive NCH research without permission.

While the Government assesses Zhou and Chen to be of equal culpability, their roles were different. To be sure, they executed the scheme as a team and both participated in securing overseas funding for their illicit business ventures. But where Chen's primary role in the States was conducting unauthorized research and using NCH time and equipment to further the scheme, Zhou was central to the development of the unauthorized external business ventures. He took the

lead in creating GenExosome Technologies (GenExosome), the American exosome company. He went to China in the spring of 2017 to further the negotiations with Avalon leadership about funding for the ultimate joint venture between Avalon and GenExosome. He negotiated the four transactions that netted Zhou and Chen $876,087 in cash, 500,000 shares of Avalon stock, a 40% stake in GenExosome, and the promise of a future payment of $450,000 from Avalon in exchange for the sale of the Defendants' Chinese company. And he took the lead on the business side of trying to operationalize Trade Secret 1 in the form of a kit that could be sold on the open market.

Zhou knew all of this was wrong. He signed NCH documentation noting his awareness of the policies he would subsequently violate. He received ongoing training reiterating all of this. But he knew he couldn't tell Dr. Besner, or anyone at the Hospital, what he and Chen were doing, or even try to ask for NCH's permission, because he knew what he was doing was wrong. And he knew it would devastate NCH and devastate Dr. Besner. But he committed these crimes anyway. If Zhou were the first defendant in this case to be sentenced, the United States would recommend a sentence toward the lower end of the guidelines range. Given Li Chen's 30-month sentence, and in light of the defendants' respective offense levels, the Government submits that a sentence of 36 months' incarceration would adequately account for the nature and circumstances of the offense, and the seriousness of the Defendant's conduct.

***General deterrence: Preventing future theft sponsored by the PRC Government.*** The Government renews the arguments from its sentencing memorandum and the sentencing hearing regarding Chen. In particular, the circumstances here present both a challenge and an opportunity when it comes to general deterrence. Zhou was working to carry out a very small part of the policy directives of the PRC—policy directives that carry a heavy price for the American businesses and

13

taxpayers that continue to unwittingly fund the PRC's global rise, and policy directives that currently pose "[t]he greatest long-term threat to our nation's . . . national security."[2] The challenge here is that no sentence will deter the PRC Government. But there is an opportunity—because of the nature of the conduct in this case, because of the victim, because of the number of people similarly situated to Zhou and Chen—to deter many other individual researchers who could be tempted by the PRC to cross a line they shouldn't. While the short-term, individual stakes of this case might seem low in the grand scheme, the long-term stakes of all the cases like this one in the aggregate are high. The United States has a strong national-security interest in curbing the massive theft of American intellectual property underway. It renews its request for a sentence that will achieve these ends.

***Restitution and forfeiture.*** Regarding restitution, the Government reincorporates its arguments above and from Chen's sentencing. Consistent with those arguments, and with the sentence imposed as to Chen, the Government asks that the sentence for Zhou include a restitution order of $2,616,087. As to forfeiture, the Government requests that the Court require Zhou to forfeit the following:

- "[A]ll of his right, title, and interest in any intellectual property involved in the crimes to which he now pleads guilty, including any intellectual property referred to in the allegations in the Indictment, and any intellectual property developed from the start of his employment at Nationwide Children's Hospital through the date of his arrest in this case" (ECF No. 127, at PAGEID #: 1040 (Zhou's Plea Agreement));
- $1,445,908.97 in United States Currency in the form of a forfeiture money judgment (ECF No. 127, at PAGEID #: 1047 ("In total, ZHOU and Chen received the $876,087, as well as $350,000 of the promised $450,000, in addition to at least $219,821.97 in other payments (some of which was salary paid to ZHOU for his role as Company 3 co-CEO), for a total

---

[2] Chris Wray, Hudson Institute Remarks, July 7, 2020, "The Threat Posed by the Chinese Government and the Chinese Communist Party to the Economic and National Security of the United States," available at https://www.fbi.gov/news/speeches/the-threat-posed-by-the-chinese-government-and-the-chinese-communist-party-to-the-economic-and-national-security-of-the-united-states (last visited January 7, 2021).

of $1,445,908.97.")); and

- The remaining items listed in Forfeiture Allegations A and B in the Indictment, which include: all rights to receive a $450,000.00 cash payment from Genexosome Technologies, Inc., as a result of the "Stock Purchase Agreement" made and entered into as of October 25, 2017, between Genexosome Technologies, Inc., Zhou, and Beijing Jieteng (GenExosome) Bitoech Co. Ltd. (ECF No. 6 ¶¶ 30, 34 (Indictment); ECF No. 148, at PAGEID #: 1192 (Chen's JNC, ordering the same)).

## IV. CONCLUSION

For these reasons, a sentence of 36 months' incarceration, forfeiture according to the parties' Plea Agreement and as requested above, supervised release of 3 years, and restitution of $2,616,087, jointly and severally with codefendant Li Chen, would be sufficient but not greater than necessary to further the ends of sentencing.

Respectfully submitted,

VIPAL J. PATEL
Acting United States Attorney

s/ J. Michael Marous
J. MICHAEL MAROUS (OH 0015322)
S. COURTER SHIMEALL (OH 0090514)
PETER K. GLENN-APPLEGATE (OH 0088708)
Assistant United States Attorneys
303 Marconi Boulevard, Suite 200
Columbus, OH 43215
Phone No.: (614) 469-5715
Fax No.: (614) 469-5653
Email: courter.shimeall@usdoj.gov
Email: mike.marous@usdoj.gov
Email: peter.glenn-applegate@usdoj.gov

## CERTIFICATE OF SERVICE

      I hereby certify that a copy of the foregoing Sentencing Memorandum of the United States was served this 6th day of April, 2021, electronically upon all counsel of record for Defendant Yu Zhou.

                                                s/ J. Michael Marous
                                                J. MICHAEL MAROUS (OH 0015322)
                                                Assistant United States Attorney